UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| BOBBIE J. DIXON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:13-cv-01195-PPS |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **OPINION AND ORDER**

Plaintiff Bobbie Dixon appeals the decision by an administrative law judge to deny her application for Social Security disability benefits. Dixon says that the ALJ's decision disregarded the opinion of her treating psychologist and was not otherwise based on substantial evidence. For the reasons outlined below, I will affirm the decision of the ALJ.

### BACKGROUND

Dixon applied for Social Security Income (SSI) on February 28, 2011, alleging a disability onset date of August 15, 2010. (DE 17 at 3; R. at 15.) Dixon's claim worked its way to the ALJ, who held a hearing on July 16, 2012. (R. 15, 36.) The ALJ issued an unfavorable decision on August 17, 2012 (R. 30), and that decision was affirmed by the Appeals Council. (DE 17 at 3-4.)

**The Medical Evidence**

Dixon's medical history includes both mental and physical impairment. As the ALJ put it at the start of the hearing, "[d]epression, anxiety, and schizoaffective disorder

are the main psychological impairments. She also has a cervical spine impairment that limits her in some fashion. I would emphasize I think that the majority of her problems that we're here for today are psychological in nature." (R. 40; *see also*, R. 20-21.) Nonetheless, the ALJ "specifically considered whether [Dixon's physical] impairment causes more than a minimal effect on [her] ability to perform basic physical work activities." (R.17.) Dixon's opening brief does not raise physical limitations in support of her claim. Dixon's attorney asked about physical limitations very briefly during the hearing. (R. 54.) Two state agency physicians reviewed the medical evidence through March 2011 and opined that Dixon "did not suffer from any severe physical impairments." The ALJ gave these opinions great weight because they were consistent with the record. (R. 28.)

To set the stage, I note that the deficiency in Dixon's claim is less the symptoms and more a lack of the necessary medical evidence. This isn't to say whether the symptoms would qualify for benefits if the evidence were available, but rather that it is impossible to evaluate that counterfactual scenario. Dixon applied for SSI in February 2011, alleging an onset date in August 2010. But Dixon's description in her brief of her medical treatment doesn't start until nine months after she first filed for disability benefits. In other words, Dixon filed for disability benefits as of August 2010 claiming a psychiatric disorder, but didn't seek treatment for that disorder until May 2011, when she saw Dr. Loren Burton at Oaklawn Psychiatric Center for therapy. What's more, Dr.

Burton didn't see Dixon regularly until after April 2012, which the ALJ considered significant. (R. 26.)

Dr. Burton's records from May 2011 note that Dixon was "being treated for panic attacks, schizoaffective disorder, and generalized anxiety disorder." (R. 362.) Dr. Burton noted that case management services might be in order, and that therapy was necessary, writing that Dixon was scheduled to return in two weeks for therapy. The session notes don't include Dr. Burton's assessment of how long Dixon might have been impaired or suffering from her conditions, or how long they were expected to continue. (*Id.*) Dixon's regular visits to Dr. Burton began almost a year later, only three months before the ALJ held the hearing in this case.

On March 16, 2011, Dixon completed a "Function Report" for herself. (R. 160-67.) She completed another one on April 3. (R. 179-86.) On March 17 Dixon's daughter Kelsey Dixon completed a Third Party Function report at the Disability Determination Bureau's Request. (DE 17 at 4; R. 170-77.) This report noted Dixon's difficulty completing household and personal care tasks independently, her issues paying attention, and her anxiety. Kelsey completed another one on May 3. (R. 196-203.)

Before 2011, records detailing Dixon's mental and emotional issues are sparse, as the ALJ noted. (R. 22-23.) An August 2010 record doesn't reference any mental issues, and is limited to things like family history of hypertension. It is true that Dixon was prescribed Xanax and Pristiq in April 2009, but there was no explanation in the record as to why. There had been a gap in medication from 2007 to 2009. (R. 22.) Office notes

began in February 2010, and they note that Dixon had applied for SSI benefits and had been denied. Dixon had a GAF score of 65. There was more activity in Dixon's medication regimen starting in March 2010 with a visit to Dr. Curry. (R. 23.) In March 2011 Dixon saw psychologist Carol Singler, Ph.D., and discussed her work and medical history, and her social interaction. Dixon said "[s]he dresses, grooms and bathes without assistance and reminder." "She denied a psychiatric history," but said she'd been diagnosed with bipolar disorder because of "massive mood swings." Dixon denied being a victim of emotional, physical, or sexual abuse. Dixon reported having a few friends, and that she "had a boyfriend and he was paying the bills for me but he went back to Michigan City about six months ago but he still helps me out." Dr. Singler assessed a GAF score of 64. (R. 23-24, 285-88.)

Dixon saw Dr. Vivek Prasad at Oaklawn on June 30, 2011, for medication review and followup. (DE 17 at 5; R. 316.) Dr. Prasad noted that Dixon was taking Prozac, Ambien, and Xanax, which her primary care provider Dr. Curry had started her on "four or five months ago." (R. 316.) Dixon reported various symptoms, including decreased sleep, mood swings, irritability, and panic attacks. Dr. Prasad diagnosed schizoaffective disorder, assessed a GAF of 55, and changed Dixon's medication regimen. (R. 316-17.) Dr. Prasad described Dixon as having "a disheveled appearance," but "good eye contact and a pleasant and cooperative attitude," with a logical, concrete, and goal-directed thought process. (R. 317.) Dr. Prasad also noted a "chronic history of panic attacks and mood swings." (R. 316.)

4

Dixon returned to Dr. Prasad on August 11, 2011, for medication and followup. She complained of irritability, but had good eye contact and a thought process that "was logical, concrete, and goal directed." She had no hallucinations. (R. 313-14.) Dr. Prasad wrote that Dixon was going to follow up with Ann Hofsommer before seeing Dr. Prasad again in three months. (R. 314.) The ALJ noted that the record contains notes from a visit to Dr. Curry on August 23, 2011, about an ankle injury sustained "3 week(s) ago at work." (R. 24.)

On November 3, 2011, Dixon saw social worker Ann Hofsommer. (R. 340-41.) Dixon complained of "[c]hronic panic attacks, [a]goraphobia, auditory and visual hallucinations, significant mood swings with depression lasting 3-4 days." (R. 340.) Hofsommer noted that Dixon had been referred to individual therapy "which she attended once and then dropped out." (R. 340.) A few days later, on November 8, Dixon saw Dr. Prasad. She reported that she hadn't been sleeping for the last three months. She said she had gone to the emergency room for fainting about 6 to 8 weeks before. Dixon was found to be potassium-deficient, and had begun taking supplements. (The record doesn't state whether the fainting was attributed to the potassium deficiency.) "She denied any outright auditory or visual hallucinations or manic behaviors." (R. 338.) Dixon's medication regime was altered again. (*Id.*)

On April 4, 2012, Dixon returned to Dr. Prasad. Prasad described Dixon as disheveled, malodorous, reeking of cigarette smoke, and with an irritable affect, but making "good eye contact." Dixon reported not sleeping well. Dr. Prasad described her

5

thought process as "illogical[,] denying any benefit from any of the medications she has tried," with "limited to poor insight and judgment into her condition and need for medications and followup." (R. 335.) Dr. Prasad assessed a GAF score of 55. (R. 336.) Dixon said her medications were not working well. She reported walking a mile per day, but she had gained weight and was smoking two packs a day. Dr. Prasad noted that Dixon had met with Loren Burton before and was willing to follow up with her. (R. 334-35.)

Dixon saw Dr. Burton again on April 17, 2012, after a long hiatus, for an individual therapy session. She would see Dr. Burton approximately 8 times between April 17 and June 29, 2012. Dr. Burton noted not having seen Dixon in several months. Dixon was concerned about losing financial support in the form of child support once her son turned 21. Dixon reported being depressed, not sleeping well, waking up in the middle of the night and being unable to fall asleep again, and having nightmares. She also reported that she sometimes slept all day. Dixon said she talked to people, "believing that they are there and then suddenly 'they're gone.'" Dixon described having difficulty distinguishing reality from dreams, and also "still" hearing voices. She reported "doing things that she can't remember doing." In terms of personal care Dixon reported not showering as often as she knew she should, and she "continues to pick at her hands and it is noted that she has no finger nails." Dixon said she usually didn't drive due to concern about her level of functioning. Dr. Burton observed that Dixon looked away from Dr. Burton "at times that she is talking." Dr. Burton's assessment was

that Dixon had "significant difficulty functioning," and may have had "specific problems with sleep that involve not being able to distinguish sleep from her waking state. [I]t is not clear whether her lack of memory for things involves dissociative experiences or a sleep disorder." (R. 372.)

Dixon saw Dr. Burton again on May 1, 2012. She reported continued trouble sleeping, but had a little more energy. Dixon said her daughter could get her to leave the house, and they had done a walk-a-thon, which Dixon found difficult at first but was able to do it once the crowd thinned. Dixon said she had panic symptoms in stores and wouldn't go out unless pushed by her family. She was concerned about her finances because she said she couldn't continue to work because she couldn't be around people. Dixon said she continued to pick at her nails with tweezers to manage anxiety. Dr. Burton assessed Dixon as having psychotic symptoms, a mood disorder, and obsessive compulsive symptoms that impaired her functioning. Dr. Burton wrote that therapy was necessary to teach Dixon how to cope with her symptoms and manage her mood because Dixon was "showing significant problems with functioning." At the end of the session Dr. Burton taught Dixon a technique for managing anxiety. (R. 370.)

On May 15 Dixon again met Dr. Burton for therapy. She reported depression and anxiety, panic attacks, difficulty leaving home, and "problems with checking things," meaning "she can be driving down the road and have to go home as she is uncertain about whether she really checked the door." Dixon said "that being outside of the house with the dogs is okay." Dixon reported difficulty in her relationship with her daughter

7

and her daughter moving things and leaving a mess. Dixon said her symptoms worsened after her father died in 2006 and her mother died in 2007. (R. 368-69.) After the May 24 session Dr. Burton described Dixon as tearful and agitated. Dixon reported having one or multiple panic attacks per day, and only going places if she had to. (R. 362.)

On June 1 Dixon told Dr. Burton that she had "anxiety over the roof" and was tearful during the session. Dixon said she was anxious about her financial situation, she couldn't handle her stress, she didn't care about anything, and she hadn't wanted to get dressed that day. She said she'd thrown up three times before that day's therapy session. Dr. Burton and Dixon agreed that Dixon would benefit from case management services. (R. 366.) On June 6 Dixon again reported to Dr. Burton that she had "anxiety over the roof." Dixon also said she wasn't eating due to stress, and that she had thrown up three times before the session. She had "feelings of worthlessness, wanting to run away from where she is at (denies suicidal thoughts), she lacks energy and doesn't take care of things or paces around the house." Dixon was anxious about life stresses, especially money and her daughter moving out of her house. (R. 364-65.)

Also on June 6 Dr. Burton completed an Adult Needs and Strengths Assessment ("ANSA form") for Dixon using the Data Assessment Registry Mental Health & Addiction ("DARMHA") form. (R. 355-61.) The form required Dr. Burton to select generic pre-written descriptions of Dixon's functioning in an assortment of areas. The form indicates significant family problems, severe work problems, moderate problems

with social functioning, and no access to or interest in recreational activities. (R. 355.) The form goes on to indicate other issues: sleep deprivation, moderate self-care impairment, significant problems with decision-making, minimal interpersonal strengths, difficulty being optimistic, no talents or interests, no positive work history, moderate disturbance in thought process, moderate impulse control problems, severe depression, severe anxiety, post traumatic stress issues, moderate anger control problems, no career plans or aspirations, a history of repeated physical and emotional abuse, moderate attachment problems, and maybe some symptoms of dissociation.

At a June 19 session Dixon reported to Dr. Burton trying to go to the store, then having a panic attack involving breathlessness and spinning and throwing up. Dixon said she had sleep problems such that if she slept past 4:30 a.m. she was confused about what day of the week it was. She also said she was easily confused. When she drove she could get disoriented and lost. Dixon was concerned about managing on her own once her daughter moved out. (R. 353-54.) The record includes a "Medical Assessment of Ability to Do Work-Related Activities (Mental)" ("Work Abilities form") dated June 20 (on the first page – the last page is dated June 26) that was completed by Dr. Burton. Dr. Burton circled "fair" or "poor/none" for all of the items related to Dixon's ability to adjust to a job and wrote that Dixon was "extremely anxious and self conscious around people and avoids leaving the house," reporting "periods where she has been talking to someone and then realizes that there is no one there." (R. 345.) Dr. Burton also circled "fair" or "poor/none" for each of the performance adjustment skills due to Dixon's

9

concentration issues, noting mistakes as Dixon counted down from 100 by sevens. (R. 345-46.) Dr. Burton once again circled "fair" or "poor/none" for each of the personal-social adjustment skills. (R. 346.) Dr. Burton assessed "extreme loss" of abilities to sustain basic work-related activities. Dr. Burton wrote on the form that Dixon's condition had been substantially the same as described since May 16, 2011. On June 29 Dixon told Dr. Burton she was sleeping a little more and having more energy, but she said she saw shadows and heard voices that were "worse or louder across the last 2 months." (R. 351.)

At the July 2012 hearing before the ALJ Dixon testified about her anxiety, depression, difficulty concentrating, and difficulty leaving her house. (R. 43.) She said for treatment she saw Dr. Moore, a psychotherapist, Br. Burton, a therapist, and Dr. Curry, her family doctor. (R. 43.) Dixon explained that Dr. Moore had replaced Dr. Prasad within a few months before the hearing. (R. 51.) She testified that she leaves her house four or five times per month. (R. 45.) Dixon said her condition had remained about the same "for a period of time, but the voices – when they change my medications, the voices get worse." (R. 48-49.) Dixon described the voices as muffled, and said she hears them daily and had been hearing them for about a year. (R. 49.) She said she sees things that aren't there, describing them as shadows, and said they made her anxious. (R. 50.) Dixon told the ALJ that she had stopped working because she didn't want to be around people. (R. 58.)

During the hearing the ALJ noted that he had seen GAF scores of 55-65, which indicates some limitation, but not to the extent suggested by Dr. Burton's ANSA form and Work Abilities form. (R. 52.) The starkly contrasting views in the record led the ALJ to say, leading up to the examination of the Vocational Expert, "I'm somewhat at a loss, counsel, because I've got the state agency's position saying no severe impairment both physically and mentally, and then I've got Dr. Burton saying essentially incapable of even the most undemanding mental and emotional requirements of any work. And there's not a heck of a lot of medical opinion indicating any middle ground. So that's giving me some hesitation in coming up with what I think would be reasonable limitations based on the entirety of the evidence as a whole." (R. 59.)

The ALJ went on to examine the vocational expert ("VE") Dr. Leonard Fisher. He described to Dr. Fisher someone limited to simple, routine, repetitive tasks; simple decision-making tasks; little change in daily work routine; and with limitations commensurate with moderate social functioning deficits. (R. 60-61.) Dr. Fisher said Dixon couldn't do her past jobs. (R. 61.) However, there were light-exertion jobs that he said she could do. (R. 62.) Dixon's attorney followed up, and Dr. Fisher said that if a person were off-task for an hour each day, or missed four days of work per month, that person would not be able to sustain a job. (R. 63-64.)

**The ALJ's Decision**

The ALJ issued an unfavorable decision on August 17, 2012. (R. 15-30.) At Step 1 the ALJ found Dixon had not engaged in Substantial Gainful Activity since applying for

benefits on February 28, 2011. (R. 17.) In Step 2 the ALJ found that Dixon has the severe impairments of depression, anxiety, and schizoaffective disorder. (R. 17.) At Step 3 the ALJ wrote that Dixon does not have an impairment or combination of impairments that meet or medically equal the severity of a listed impairment. (R. 18.) Dixon's representative had affirmed this at the hearing. (R. 19, 40.)

In considering Dixon's Residual Functional Capacity ("RFC") in the second part of Step 3, the ALJ found that she has the RFC to work at all exertional levels, but is moderately limited with respect to her concentration, persistence, or pace, so is limited to simple tasks, simple decision-making, and work with only minimal variation, as well as work commensurate with Dixon's moderate social functioning deficits. (R. 19-20.) In this step the ALJ extensively described Dixon's medical history as reflected in the record. (R. 20-28.) The ALJ noted contradictory evidence in the record – some doctors' records didn't contain any information about mental or emotional issues, while Dr. Burton's records indicated severe issues. The ALJ acknowledged the apparent worsening of Dixon's conditioning in April 2012, but determined that "the record as a whole does not establish that this recent exacerbation was disabling, or that it had lasted or was expected to last a continuous twelve months. No doctor changed the claimant's overall GAF score from the previous 55, which indicates moderate symptoms or limitations, and which is consistent with the capacity I attribute to the claimant." (R. 26.)

The ALJ considered it significant that Dixon's claim relies heavily on Dr. Burton's assessment, and Dr. Burton described treatment beginning in May 2011, but in reality

there was only a regular treatment relationship beginning in April 2012. (R. 26.) Further, the ALJ largely discounted Dr. Burton's assessment of Dixon as essentially nonfunctional because that assessment had no support in the record other than Dr. Burton's opinions. Other doctors had not found that Dixon suffered from anywhere near that level of impairment. (R. 26.)

The ALJ also found that, even if Dr. Burton's assessments were correct, they were only true as of April 2012, and there was no indication that Dixon's status had existed for 12 months before the hearing, or would remain the same for 12 months. (R. 26-27.) The ALJ stated that he defined Dixon's RFC giving her the "significant benefit of the doubt," applying certain restrictions not specifically supported by the record outside of Dr. Burton's assessment, although at a level less severe than Dr. Burton assessed. (R. 27.) Ultimately, in this step, the ALJ found "that there is simply insufficient evidence to substantiate the claimant's claims." (R. 28.)

In Step 4 the ALJ found that Dixon had no past relevant work against which to measure her RFC. (R. 28.)

Finally, in Step 5 the ALJ considered Dixon's age, education, work experience, and RFC, and found that there are jobs that exist in significant numbers that she can do. Therefore the ALJ found Dixon not disabled for the purpose of awarding SSI benefits. (R. 29-30.)

**DISCUSSION**

My review of an ALJ's decision to deny social security benefits is limited to determining whether the decision is supported by substantial evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). "Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion." *Id.* The question before me is not whether or not Dixon is disabled, but whether there is substantial evidence in the record supporting the ALJ's decision that she's not. *Books v. Chater*, 91 F.3d 972, 977 (7th Cir. 1996). In other words, the ALJ's decision, if supported by substantial evidence and reached under the correct legal standard, will be upheld even if reasonable minds could differ as to the appropriate conclusion. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). It is not my job to re-weigh evidence, choose among conflicting versions of events, decide questions of credibility, or substitute my own judgment for the ALJ's. *Young*, 362 F.3d at 1001.

Dixon contends that the ALJ erred by assessing a mental RFC unsupported by substantial evidence or the relevant legal standards. Dixon argues he made this error by improperly discounting Dr. Burton's opinion and Dixon's and her daughter's claims, and also by failing to take into account Dixon's psychological decompensation. Dixon argues that the ALJ then used this erroneous RFC for the rest of the analysis, rendering incomplete hypothetical questions for the VE. She alleges those hypothetical questions led to uninformed and incorrect testimony by the VE that in turn led to a mistaken Step 5 assessment of jobs Dixon can perform. Boiled to their essence, the alleged errors all

14

stem from the ALJ's assessment of Dixon's RFC based on the record. That's where I'll focus.

The ALJ rejected Dr. Burton's opinion, and also Dixon's self-reporting and her daughter's reporting to the extent they portray Dixon's condition as more severe than the rest of the record indicates. (R. 26-28.) He rejected Dr. Burton's assessment because it is inconsistent with the record as a whole. The record does not indicate that Dixon's condition is anywhere near as serious as the ANSA form suggests — the form describes someone who is nearly non-functional in every way, with poor-to-no functional ability across the board. (R. 26.) But the history of GAF scores and the notes from other treating doctors within a year before the ALJ's hearing don't suggest nearly such severe limitations. Even Dr. Burton's own notes from therapy sessions don't indicate a non-functional person, but rather a significantly impaired one. For instance, Dixon drove herself to appointments and generally behaved appropriately.

The ALJ acted within the bounds of the law: a treating physician's opinion receives controlling weight only "if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford v. Apfel*, 227 F.3d. 863, 870 (7th Cir. 2000) (citing 20 C.F.R. § 404.1527(d)(2)). Moreover, "[a]n ALJ is not required to accept a doctor's opinion if it is brief, conclusory, and inadequately supported by clinical findings." *Gildon v. Astrue*, 260 Fed. App'x 927, 929 (7th Cir. 2008) (citations and quotations omitted). Additionally, a claimant is not entitled to benefits just because a physician finds her "disabled" or "unable to work." In fact, opinions by a

physician, treating or otherwise, that a claimant is "unable to work" are not considered medical opinions at all, and "are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." 20 C.F.R. § 404.1527(d)(1-2); *see also*, *Clifford*, 227 F.3d. at 870.

Where an ALJ discounts a treating physician's opinion after considering the extent to which the opinion is supported by medical findings and is consistent with substantial evidence in the record, the ALJ need only "minimally articulate[]" his reasons for doing so. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (citations omitted). In this case, the ALJ carefully considered Dr. Burton's treating relationship with Dixon, wrote up a detailed description of Dr. Burton's treatment records, and found that Dr. Burton's conclusions about Dixon's level of impairment were inconsistent with substantial evidence in the record. The ALJ found unsupported Dr. Burton's conclusory opinion that Dixon is virtually unable to function, expressed mostly through picking generic descriptions on the ANSA form and circling one-word descriptors on the Work Abilities form, which both purported to determine Dixon's level of impairment. Given that logical determination, and the ALJ's review of the medical evidence, the ALJ has clearly met the standard of minimal articulation, and remand is unwarranted.

As for Dixon's argument about a possible period of decompensation, the ALJ does acknowledge that Dixon's condition may have worsened beginning around the time she started therapy with Dr. Burton in April 2012, but the ALJ is correct that there is "no clear indication that such worsened condition is disabling or expected to last for

twelve months." (R. 26.) That is, even if the condition were disabling as of April 2012, the ALJ is correct that there is no evidence that it would last the period of time required for it to qualify as disabling under the law, and it had not lasted the requisite period by the time the ALJ held his hearing. There is certainly not substantial medical evidence in the record that Dixon's condition was disabling before April 2012.

In summary, the ALJ's opinion outlined sufficient evidence to support rejecting Dr. Burton's opinion and the assessments of Dixon and her daughter. But even if Dr. Burton's opinion weren't discounted, there is nothing in it to suggest a disabling condition of the duration required for an award of benefits. For these reasons I find no error.

The ALJ used his assessment of the entire record in forming his description of Dixon's RFC. As I've said, discounting Dr. Burton's assessment in evaluating the record was not erroneous, nor was taking with a grain of salt Dixon's own self-assessment or her daughter's non-medical third-party assessment. The ALJ factored into the RFC the fact that he found Dixon to be severely impaired, and the RFC therefore included substantial, and reasonable, limitations. The RFC described someone who could work at all exertional levels, but is moderately limited with respect to her concentration, persistence, or pace, so is limited to simple tasks, simple decision-making, and work with only minimal variation, as well as work commensurate with Dixon's moderate social functioning deficits. There is no evidence that these restrictions fail to reasonably accommodate Dixon's mental limitations. *See Outlaw v. Astrue*, 412 Fed. App'x. 894, 897

(7th Cir. 2011) (finding that limiting the claimant's RFC to include only unskilled work, with no public contact, did provide reasonable accommodations for the claimant's mental limitations). These restrictions are supported by Dixon's medical records and treatment history.

In forming the RFC the ALJ acknowledged that his assessment and specific set of limitations were not directly drawn from the record. However, he was not "playing doctor" as Dixon alleges. He was looking at the record, giving little weight to Dr. Burton's assessment, and then giving Dixon the benefit of every doubt with respect to the rest of the record. And although the ALJ correctly pointed out that Dixon had not been limited to light exertion by any doctor's orders, even assuming she were so limited the VE confirmed that there are jobs she could do. Accordingly, the ALJ's determination as to Dixon's mental impairments is appropriate, and his decision is affirmed.

## CONCLUSION

The ALJ provided legitimate reasons for his opinion. While reasonable minds could differ, the only issue is whether the conclusion reached by the ALJ was supported by substantial evidence, and it was. Accordingly, the decision of the ALJ is **AFFIRMED**.

**SO ORDERED.**

ENTERED: February 11, 2015

/s/ Philip P. Simon
**PHILIP P. SIMON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**